**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**MELODI O'NEAL**                                                                                    **PLAINTIFF**

**v.**                                        **Case No. 4:18-cv-00524-LPR**

**RON SELF, individually and
in his official capacity as employee of
the Little Rock School District,
JORDAN EASON, individually and
in her official capacity as employee of
the Little Rock School District**                                                **DEFENDANTS**

<u>**ORDER**</u>

     Pending before the Court is a Motion for Summary Judgment by Defendants Ron Self and Jordan Eason.[1]  In her Complaint, Plaintiff Melodi O'Neal brings claims for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*; the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; and the Arkansas Civil Rights Act ("ACRA"), Arkansas Code Annotated § 16-123-101 *et seq.*[2]  Ms. O'Neal alleges that Defendants Ron Self and Jordan Eason, employees of the Little Rock School District ("LRSD"), discriminated against Ms. O'Neal because of her disability and unlawfully retaliated against her.  Defendants Self and Eason move for summary judgment on the claims against them.[3]  For the reasons discussed below, the Court GRANTS the Motion in its entirety.

---

[1]  Defs.' Mot. for Summ. J. (Doc. 14).

[2]  Pl.'s Compl. (Doc. 1).

[3]  Defs.' Mot. for Summ. J. (Doc. 14).

# I. <u>Background</u>[4]

The LRSD first employed Ms. O'Neal during the 2012-13 school year.[5]  She worked as a full-time security officer at Gibbs Elementary School.[6]  Ms. O'Neal's duties included patrolling school grounds and buildings, ensuring playground safety, ensuring that gates and doors were locked, overseeing school dismissal, and ensuring that children were picked up correctly.[7]  Dr. Felicia Hobbs was the principal at Gibbs Elementary School and supervised Ms. O'Neal during the entire time that Ms. O'Neal worked at Gibbs Elementary School.[8]

In 2014, Ms. O'Neal became ill, and her condition worsened in 2015 and 2016.[9]  During that time, Ms. O'Neal had a history of respiratory infections.[10]  After a visit with her doctor, Matthew Steliga, on February 22, 2016, Ms. O'Neal learned that she would need surgery.[11]  She requested, and was granted, leave under the FMLA for the time period of March 31 to June 21, 2016.[12]  On April 1, 2016, Ms. O'Neal had her right lung surgically removed.[13]  Dr. Steliga's initial time estimate for her recovery was "[5] to 10 days of inpatient recovery and 2.5 to 3 months of home recovery time."[14]  On April 21, 2016, Dr. Steliga recommended that Ms. O'Neal "remain

---

[4]   On summary judgment, the Court recites the genuinely disputed facts in a light most favorable to the Plaintiff, including giving the Plaintiff all reasonable inferences from the facts.  The Court considers the most pro-plaintiff version of the record that a rational juror could conclude occurred.  Accordingly, the Court's factual recitation is only good for the summary judgment motion.

[5]   Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶ 1.

[6]   *Id.*

[7]   Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 19:16–21.

[8]   *Id.* at 18:21–25, 19:1–10.  The parties dispute who supervised Ms. O'Neal.  Ms. O'Neal maintains that Ms. Hobbs was her supervisor, while Mr. Self stated that Lieutenant Newth supervised Ms. O'Neal.  Ex. B to Pl.'s Resp. to Statement of Facts (Doc. 25-4) at 6:2–34.  This dispute is not material.

[9]   Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶ 2.

[10]   Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 22:2–5.

[11]   *Id.* at 22:22–25.

[12]   *Id.* at 22:14–17, 24:8–14.

[13]   Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶ 3.

[14]   Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 23:14–17.

out of work until August 1st, 2016."[15]

Then, on July 21, 2016, Dr. Steliga noted that Ms. O'Neal would be "able to work on level ground and do light activity such as walking, but [could] not do any straining or lifting [of] more than 10 pounds."[16] He informed Ms. O'Neal that she was medically unable to do things like heavy lifting or climbing stairs.[17] He also told Ms. O'Neal that she was medically unfit to intervene in altercations.[18] He instructed Ms. O'Neal that she was not medically cleared to return to work until after her appointment on October 20, 2016.[19] As a result, the LRSD approved Ms. O'Neal to take additional FMLA leave during August 9–29, 2016.[20] By August 29, 2016, Ms. O'Neal had exhausted her FMLA leave.[21] Accordingly, the LRSD granted Ms. O'Neal 34 days of medical leave under the ADA beginning August 30, 2016 and ending on October 21, 2016.[22]

Ms. O'Neal next visited Dr. Steliga on September 13, 2016.[23] He restricted her from climbing stairs quickly, jumping, and running.[24] He also limited her maximum number of hours performing sedentary work activities to four hours during an eight-hour shift.[25] For the categories

---

[15] *Id.* at 24:23–25:1.

[16] *Id.* at 25:3–13.

[17] Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶ 4.

[18] *Id.*; Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 25:24–26:2.

[19] Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶ 5; Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 26:10–15. Ms. O'Neal maintains that these restrictions were based on the doctor's understanding of the security officer's role Ms. O'Neal currently had and not on the role of a mobile-patrol officer. Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶ 4.

[20] Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶ 6. Defendant Jordan Eason worked for the LRSD as an employee relations specialist in human resources and administered FMLA leave as well as ADA accommodations. Ex. A to Pl.'s Resp. to Statement of Facts (Doc. 25-3 at 5:24–25; 7: 2–14). The parties do not address a gap in Ms. O'Neal's FMLA leave from June 21, 2016–August 8, 2016. The Court presumes that the gap represents a time period when Ms. O'Neal would not need leave because she would not have been working during the summer between the 2015-16 and 2016-2017 school years.

[21] Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶ 6.

[22] *Id.*

[23] *Id.* ¶ 7.

[24] *Id.*; Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 28:16–20.

[25] Pl.'s Resp. to Statement of Material Facts (Doc. 25-2) ¶ 7; Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 29:17–

of light, medium, and heavy work activity, the doctor approved "zero" hours.[26]  On October 13, 2016, Dr. Steliga wrote a note restricting Ms. O'Neal from working indefinitely.[27]  The doctor also wrote that Ms. O'Neal has "shortness of breath with any activities related to [her] line of work," and that the removal of her lung caused her to "have significant difficulty breathing with any exertion."[28]

During Ms. O'Neal's leave, she and Ms. Eason had several interactive process meetings.[29] In those meetings, they discussed Ms. O'Neal's job description and her physical limitations.[30]  On November 11, 2016, Ms. O'Neal completed an Interactive Process Questionnaire for the LRSD.[31] The Interactive Process Questionnaire asked Ms. O'Neal to describe her impairment.[32]  She responded that she "has one lung, shortness of breath, difficulty breathing and nerve damage . . . ."[33]  When asked "what adjustments to the work environment or position responsibilities would enable the employee to perform the essential functions of the position," Ms. O'Neal responded "none at this time."[34]  Her responses further stated that she "should remain out of work indefinitely."[35]

---

30:6.

[26]  Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 30:7–15.

[27]  Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶ 8; Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 31:12–17.

[28]  Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 31:18–24.  Ms. O'Neal states that, for both of these visits, Dr. Steliga's limitations on her activity were based on her existing and unmodified security officer position, and not the mobile-patrol position to which she had applied.  Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶¶ 7, 8.

[29]  Ex. A to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-3) at 10:21–11:17.

[30]  *Id.* at 11:15–17.

[31]  Pl.'s Resp. to Statement of Material Facts (Doc. 25-2) ¶ 9.

[32]  Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 32:20–33:6.

[33]  *Id.* at 33:2–6.

[34]  *Id.* at 33:15–23.

[35]  *Id.* at 33:21–23.

On January 9, 2017, Ms. O'Neal visited Dr. Steliga again.[36]  The doctor again did not release Ms. O'Neal to return to work.[37]  His medical opinion was that Ms. O'Neal should "remain out of work indefinitely" due to her difficulty breathing from exertion.[38]  The LRSD approved leave under the ADA for the period of January 9, 2017 to March 17, 2017 for Ms. O'Neal.[39]  The LRSD approved additional leave under the ADA for March 27, 2017 through May 31, 2017.[40]  As a result, Ms. O'Neal was on leave for the entire 2016-17 school year.[41]

Ms. O'Neal saw Dr. Steliga again on April 26, 2017.[42]  At this point, Dr. Steliga decided that Ms. O'Neal was sufficiently recovered from her surgery to return to work.[43]  He indicated that Ms. O'Neal still had some issues with shortness of breath with exertion.[44]  But he determined that she was well enough to return to work starting in the fall of 2017.[45]  Sadly, on June 27, 2017, during the summer before the 2017-18 school year started, Ms. O'Neal was in a car accident that resulted in injury to her lower back.[46]  When she visited St. Vincent Clinic Convenient Care later that summer on July 28, 2017, the clinic indicated that Ms. O'Neal could return to work on July 30, 2017 with "some limitations of light duty" and advised that Ms. O'Neal should refrain from sitting for more than thirty minutes and standing for longer than sixty minutes.[47]  Ms. O'Neal was

---

[36] Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶ 12.

[37] *Id.*

[38] Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 35:11–25.

[39] Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶ 13.

[40] *Id.* ¶ 15.

[41] *Id.*  Again, Ms. O'Neal testified that Dr. Steliga's decisions not to clear Ms. O'Neal for work were based on considering her security officer position without any accommodations.

[42] Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 37:2–4.

[43] *Id.* at 37:2–8.

[44] *Id.* at 37:9–12.

[45] *Id.* at 37:13–15.

[46] Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶ 17; Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 38:12–39:20.

[47] Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 40:16–41:3.

also advised against lifting anything heavier than five pounds or "bending or reaching overhead for 10 days or until cleared by physical therapy."[48]

On August 4, 2017, Ms. O'Neal's physical therapist at Stedman's Physical Therapy stated that Ms. O'Neal was "unable to return to work until further notice" because of the medical restrictions on "prolonged sitting or standing, bending or lifting."[49]  On September 18, 2017, Dr. Watson, from Autumn Road Family Practice, also stated that Ms. O'Neal was "unable to return to work until further notice" due to her injuries from the car accident.[50]  Specifically, Ms. O'Neal experienced severe pain in her lower back and left leg after the accident.[51]  Her physical therapist stated that "it may take many months until [Ms. O'Neal] is [in] pre-accident condition, but [she] could still have limitations."[52]  At this point, Ms. O'Neal had not received medical clearance to return to work following the June car accident and she had not worked for the LRSD since March 31, 2016.

### *Mobile-Patrol-Unit Officer Position*

Much of the focus of this case centers around Ms. O'Neal not getting a mobile-patrol position.  In May 2016, the LRSD made an online posting "that sought applications for vacant mobile-patrol positions."[53]  Ms. O'Neal applied for a permanent mobile-patrol position three times while she was on leave—in May, June, and October of 2016.[54]  Additionally, in June of 2017, Ms.

---

[48] *Id.* at 41:4–8.

[49] *Id.* at 41:15–42:2.

[50] *Id.* at 42:3–15.

[51] *Id.* at 45:13–25.

[52] *Id.* at 44:10–13.

[53] Ex. 7 to Defs.' Mot. for Summ. J. (Doc. 14-7) ¶ 3; Ex. D to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-6) at 7.

[54] Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 48:8–22.  On June 22, 2016, Ms. O'Neal spoke with LRSD human resources and said that she could not get anyone to speak with her about the mobile-patrol position.  Ex. D to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-6) at 5.  On July 18, 2016 and again on August 22, 2016, Ms. O'Neal

O'Neal applied to a mobile-patrol position a fourth time, although this position had a limited, one-year term.[55]

Defendant Ron Self worked as the Director of Safety and Security for the LRSD starting in July of 2015 and had knowledge of the hiring process for the mobile-patrol positions.[56]  In his deposition, Mr. Self described the duties of the mobile-patrol job as "handl[ing] all the bus stops, mornings and afternoons, respond[ing] to all the elementary school issues, mostly with parents, because elementary school issues are typically with parents.  And then assist[ing] with the middle schools and high schools as needed."[57]  Handling bus stops entailed "check[ing] on bus stops, as well as get[ting] calls to them, for parents fighting, kids fighting, anything you can imagine."[58]  For her part, Ms. O'Neal testified that mobile officers are called upon to intercede in altercations and other disturbances, and that there is a need to respond quickly to these situations.[59]

The LRSD job description for the mobile-patrol position listed qualifications and basic performance responsibilities.[60]  The twelve qualifications for the position were the following:

(1)  Must be 21 years of age.

(2)  Must have a high school diploma or equivalent.

(3)  Minimum of three (3) years of related experience required.

---

filed formal complaints with human resources for the LRSD.  *Id.*  On September 6, 2016, Ms. O'Neal filed a formal charge with the EEOC.  *Id.*

[55]  Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 49:6–9.  The first position was posted on May 16, 2016 and was listed as closing for applications on June 15, 2016.  Ex. D to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-6) at 7.  Ms. O'Neal states that the position was reposted and she applied a second time.  *Id.* at 5, 8.  The third time she applied, the job was posted on October 7, 2016 with a closing date of October 21, 2016.  *Id.* at 5, 10–11.  The one-year temporary mobile position opening was communicated by email by Mr. Self on June 15, 2017.  *Id.* at 12.  Ms. O'Neal applied to it on June 22, 2017.  *Id.* at 13.

[56]  Ex. 7 to Defs.' Mot. for Summ. J. (Doc. 14-7) ¶ 1; *see also* Ex. B to Pl.'s Resp. to Defs.' Mot. for Summ. J. (25-4) at 44:2–24 (discussing the hiring process for the mobile-patrol position).

[57]  Ex. B to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-4) at 40:2–6.

[58]  *Id.* at 40:7–12.

[59]  Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 88:13–89:25.

[60]  Ex. D to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-6) at 15–16.

(4)   Associates degree or higher from an accredited college or university preferred.

(5)   No misdemeanor arrests or convictions in the last six (6) years.

(6)   No felony arrests or convictions.

(7)   Must have a valid driver's license [and the following:]

No conviction for careless or reckless driving or DWI in the last (7) years.

No at fault accidents in the past 3 years.

No moving traffic violations in the past three (3) years.

Have not had driver's license suspended, denied, or revoked in the past three (3) years.

(8)   Must be willing to submit to and pass a drug test.

(9)   Must be able to meet the physical requirements of the job and possess the ability to work in all environmental conditions to perform common security functions and duties.

(10) A working knowledge of School and State Criminal Law.

(11) Knowledge of accident investigation (preferred).

(12) Applicants with bilingual skills are encouraged to apply.[61]

The job description also listed fourteen items constituting "Basic Performance Responsibilities":

(1)   Investigates traffic accidents occurring to school vehicles.

(2)   Investigates incidents and provide[s] detailed reports about the incidents.

(3)   Patrols a designated area of the city in a cruiser.

(4)   Assists in transporting students who have been identified as behavior problems.

(5)   Observes and reports any unlawful activity.

(6)   Protects individuals and property from harm, theft, trespassing, fire, and accidents.

(7)   Neutralize situations calmly with tact and good judgement.

(8)   Responds to calls for service at all LRSD locations.

---

[61]   *Id.* at 15.

(9) Monitors bus stops proactively to prevent any incidents from occurring.

(10) Watch for safety and fire hazards and other security related situations.

(11) Ability to communicate effectively in the English language, both verbally and in written form.

(12) Cooperate with and assist other officials on scene.

(13) Assists school-based officers in the conducting of safety and security related issues.

(14) Performs other related duties as assigned.[62]

### *Evaluation of Ms. O'Neal for the Mobile-Patrol Position*

The LRSD posted eleven mobile-patrol job openings.[63] There were eight criteria used to evaluate applicants: "(1) whether the applicant possessed three years of security experience; (2) whether the applicant possessed law enforcement experience; (3) whether the applicant possessed a college degree; (4) whether the applicant was a current [LRSD] employee; (5) performance evaluation; (6) whether the applicant possessed supervisory experience; (7) whether the applicant possessed an advanced college degree[]; [and] (8) whether the applicant possessed public school experience."[64] Evaluators awarded applicants one point each for categories one, two, six, seven, and eight.[65] Category three earned an applicant one point for an associate degree and two points for a bachelor's degree.[66] And applicants could receive a max of five points for category five (performance evaluation).[67] This means that LRSD employees could receive a maximum of

---

[62] *Id.* at 15–16.

[63] Ex. E to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-7) at 27:23; Ex. D to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-6) at 7.

[64] Ex. 7 to Defs.' Mot. for Summ. J. (Doc. 14-7) ¶ 5.

[65] *Id.* ¶ 6.

[66] *Id.* ¶ 7.

[67] *Id.* ¶ 8. Category four (current LRSD employee) earned zero points for applicants. *Id.* The record is not clear on why this category exists given that no points are awarded for this category.

twelve points and applicants who were not employed by the LRSD at that time could receive a maximum of seven points.[68]

Based on the eight criteria for evaluation of applications, Ms. O'Neal's application for the mobile-patrol position was rated a five.[69] This rating was based, in part, on Ms. O'Neal receiving a score of three on her performance evaluation.[70] Defendants state that Security Supervisors Donald Allen and Ricky Newth conducted the performance evaluations and that their individual scores were averaged to determine Ms. O'Neal's score of three.[71] These performance evaluations are not in the record and there is apparently conflicting evidence as to how many evaluators there were. In a September 7, 2016 email to Ms. Eason, Mr. Self wrote that "[t]he evaluation [between] 1 and 5 was given back around October of 2015 by William Newth, Mike Green, and Don Allen. I asked them to rank the others due to the fact that I was not familiar with most of them."[72] In the instant litigation, Defendants say that only Don Allen and Ricky Newth evaluated Ms. O'Neal and that the average of their scores equaled three.[73] Ms. O'Neal appears to concede that her score of a three came from performance evaluations done by Messrs. Newth and Allen in 2015.[74] She explains that Mr. Self told her that she "had been evaluated by three supervisors, Don Allen, Mike Green, and Rick Newth," but when she "got the scores, it turned out that Mike Green had not rated

---

[68]  *Id.* ¶ 14.

[69]  *Id.* ¶ 17.

[70]  *Id.* ¶ 13.

[71]  *Id.* ¶¶ 11–13.

[72]  Ex. D to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-6) at 17.

[73]  Ex. 7 to Defs.' Mot. for Summ. J. (Doc. 14-7) at 2.

[74]  Ex. D to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-6) at 4.

[her] at all."[75] Ms. O'Neal complains that Mr. Green should have evaluated her as well, contending that his evaluation would have been better.[76]

The performance evaluation scores were derived from the following evaluation matrix: 5 for "Superb," 4 for "Good," 3 for "Needs additional training," 2 for "Has difficulties performing day to day job functions," and 1 for "Needs constant supervision."[77] Ms. O'Neal recounted that Mr. Allen stated in a public hearing that Ms. O'Neal's score of three points out of five was based on two issues.[78] First, Mr. Allen said that Ms. O'Neal had worn shorts.[79] Ms. O'Neal stated that her supervisor, Dr. Hobbs, and Bobby Jones, the Director of Safety and Security at the time, gave her permission to wear shorts.[80] Second, there was an issue with police being called to Gibbs Elementary School during the morning drop off period.[81] Mr. Self also referenced this issue in an email to Ms. Eason regarding scoring.[82] Ms. O'Neal explained that she was not scheduled to work during the time of that incident.[83]

Ms. O'Neal also produced a May 2015 performance evaluation from Dr. Hobbs, the Gibbs Elementary School principal.[84] In four of nine categories for "Performance Standards," Dr. Hobbs

---

[75] *Id.* at 3.

[76] *Id.* at 4. Ms. O'Neal also refers to a text message between herself and Mr. Newth that she contends provides evidence that the performance evaluations were "all Self." *Id.* at 3. The Court notes that the referenced text message does not appear to support Ms. O'Neal's position. The entire text message states: Ms. O'Neal: "evaluation number on me to Mr. Self we all have a spread sheet that is based on the criteria in the job description, this is for the patrol position." Mr. Newth: "I have no idea I am not invoked [sic], invoked [sic], this is all self." *Id.* at 18. Mr. Newth is simply stating that he is not involved in the mobile-patrol-unit hiring process.

[77] *Id.* at 17.

[78] *Id.* at 3.

[79] *Id.*

[80] *Id.*

[81] *Id.* at 3–4.

[82] *Id.* at 17.

[83] *Id.* at 3–4.

[84] *Id.* at 19–23.

noted that Ms. O'Neal was "Distinguished – Exceeds Expectations – Overall superior performance and job strengths."[85]  In the remaining five categories, Ms. O'Neal was "Proficient – Meets Expectations – Demonstrates competent levels in consistent manner."[86]  In six out of the twenty-three categories for "Job Specific Performance Factors (Non-Supervisory) Major functions aligned with Job Description," Dr. Hobbs rated Ms. O'Neal "Distinguished."[87]  In the remaining seventeen categories, Ms. O'Neal was rated "Proficient."[88]  Ms. O'Neal did not receive any ratings that were "Basic – Needs Improvement – Denotes skill deficiencies or job-related behaviors requiring correction" or "Below Basic – Unsatisfactory – Skill deficiencies or job-related behaviors which are incompatible with continued development."[89]

Mr. Self stated that neither Ms. O'Neal's medical condition nor her use of FMLA leave played a role in the evaluation of her candidacy for the mobile-patrol position.[90]  However, Ms. O'Neal testified that, during an interactive meeting with Ms. Eason and Mr. Self, Mr. Self told Ms. O'Neal that he did not allow her to interview for the patrol officer positions because of her disability.[91]  Mr. Self also made several references to Ms. O'Neal about how he did not understand what was "wrong with [her.]"[92]  Mr. Self asked, "if [Ms. O'Neal] was punched in the chest, would [she] simply cave in and fall down?"[93]  Ms. O'Neal stated that Mr. Self and Ms. Eason called her a liability and that she considered these comments to be "discriminatory, offensive, [and]

---

[85]  *Id.* at 19.

[86]  *Id.*

[87]  *Id.* at 19–20.

[88]  *Id.*

[89]  *Id.*

[90]  Ex. 7 to Defs.' Mot. for Summ. J. (Doc. 14-7) ¶ 19.

[91]  Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 51:1–12.

[92]  *Id.* at 86:10–14.

[93]  *Id.*

hurtful."[94]

In addition to the three points from her performance evaluation, Ms. O'Neal received one point for public school experience and one point for security experience.[95]  Beyond contending that her performance evaluation was scored improperly, Ms. O'Neal also contends that she should have received additional points on her application score.[96]  Specifically, Ms. O'Neal asserts that she should have received one point for supervisory experience, although her basis for this assertion varies from saying she "supervised 100s of employees" to saying she "supervised 100s of inmates/felons as an ADC security guard."[97]  Ms. O'Neal also argues that she should have received another point for law enforcement experience based on her role as a corrections officer.[98]

Sixty-one individuals applied for the mobile-patrol positions.[99]  Out of those individuals, the LRSD invited twenty for interviews.[100]  The lowest score of an individual who was invited for an interview was 5.33.[101]  Out of the interviewees, six was the lowest score for a candidate who got the job.[102]  Ten other candidates received the same score as Ms. O'Neal (a five) and none of those candidates were invited for an interview either.[103]  When Ms. O'Neal asked Mr. Newth about why she did not receive an interview, Mr. Newth told Ms. O'Neal that Mr. Self made that

---

[94] *Id.* at 86:20–24.

[95] Ex. D to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-6) at 4.

[96] Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶ 32.

[97] *Id.* ¶¶ 31–32.  Ms. O'Neal points to no evidence to back up either assertion.

[98] *Id.*

[99] Ex. 7 to Defs.' Mot. for Summ. J. (Doc. 14-7) ¶ 15.

[100] *Id.*

[101] *Id.* ¶ 16.

[102] *Id.*

[103] *Id.* ¶ 18.

decision.[104]  In his deposition, Mr. Self stated that Ms. O'Neal was "basic qualified, yes" for the mobile-patrol position even though she did not have enough points to get an interview.[105]

One more set of facts bears mention here.  As will be seen in the discussion section below, there is a dispute of fact as to whether Ms. O'Neal could perform the essential functions of the mobile-patrol position with or without a reasonable accommodation.  That may boil down to whether running to emergencies and breaking up physical altercations are essential functions of the mobile-patrol position.  On the one hand, there is evidence that this type of physicality is required.  Mr. Self testified that a physical fitness test for security officers existed when he started with the LRSD in 2015 and that he was part of updating it.[106]  The test includes performing fifteen sit-ups and fifteen push-ups, running a mile in under sixteen minutes, and dragging a dummy across a gym floor.[107]

On the other hand, the test is applied to new hires but not to current employees.[108]  Also, Ms. O'Neal testified that Thomas Watson, a mobile-patrol officer, has a "severe limp" and "could barely walk."[109]  She testified that, with one lung, she was in better physical shape than several of the other officers.[110]  She testified that several officers were obese and physically incapable of running or climbing stairs.[111]

---

[104] Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 72:2–7.

[105] Ex. B to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-4) at 45:1–3.

[106] *Id.* at 11:24–12:10.

[107] *Id.* at 12:13–13:8.

[108] *Id.* at 13:19–22.

[109] Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 87:12–18.

[110] *Id.* at 90:2–6.

[111] *Id.* at 92:9–112:21.

Moreover, Mr. Steven Randal O'Neal, Ms. O'Neal's husband, worked as a security officer with the LRSD, and then as a security supervisor.[112]  He worked at Central High School from 2010–2014, and in 2014 he moved to work at another high school—J.A. Fair.[113]  He provided an affidavit in this matter attesting to the physical deficiencies of several LRSD security officers.[114] As a security supervisor, Mr. O'Neal requests security staff for school events and is familiar with their work performance.[115]  Mr. O'Neal asserted that Ms. O'Neal's physical condition was "at least as good or better than" seven of the security officers he listed.[116]  Mr. O'Neal described the officers as being too obese to run or intervene in altercations.[117]  Notably, he listed Johnny Green as someone who was obese and had failed the physical test for new hires but was hired anyway.[118] And Mike Green, a lieutenant in safety and security, was under doctor's orders to not be around altercations but was still employed.[119]  Another officer, Mr. Hammick, injured his hand and was on "limited duty" working at a desk and was "not to assist with any altercation."[120]

### Termination of Employment with the LRSD

Mr. Self described how the LRSD had to reduce its operating budget because of "a pending loss of more than $35 million in desegregation funding from the State of Arkansas."[121]  As a result of the decrease in desegregation funding, LRSD security officer positions in elementary schools

---

[112] Ex. E to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-7) at 5:8–13.

[113] Ex. C to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-5) at 1.

[114] *Id.* at 1–2.

[115] Ex. E to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-7) at 12:1–16.

[116] Ex. C to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-5) at 2.

[117] *Id.* at 1–2.

[118] *Id.* at 1.

[119] *Id.* at 2.

[120] Ex. E to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-7) at 17:20–18:13.

[121] Ex. 7 to Defs.' Mot. for Summ. J. (Doc. 14-7) ¶ 2.

were cut.[122]   At some point during Ms. O'Neal's leave, the security officer position at Gibbs Elementary School (where she had previously worked) was eliminated.[123]   In May of 2017, Ms. Eason emailed Ms. O'Neal with job openings in the LRSD.[124]   Ms. Eason offered a part time kitchen position to Ms. O'Neal.[125]   Eventually, Ms. O'Neal accepted placement as a security officer at Central High School but did not report there before her termination (discussed below).[126]

On August 15, 2017, Jordan Eason, the Employee Relations Specialist for the LRSD, sent Ms. O'Neal a letter regarding her medical leave status.[127]   The letter stated in part,

> After further review and reflection following the conclusion of the interactive process meeting held on August 10, 2017 regarding your medical leave status, a decision was made that the Little Rock School District (LRSD) will be unable to reasonably accommodate you further under the Americans with Disabilities Act (ADA), as amended by the ADA Amendments Act (ADAAA), due to your inability to return to work after an extended medical leave of absence. You were unfortunately unable to report to work the entire 2016-17 school year last year. During that time, the LRSD provided you with multiple extensions of your extended medical leave in order to assist you in your medical recovery. In addition, you fortunately had the summer months to assist you in your recovery.[128]

The letter from Ms. Eason explained that the LRSD received a letter from Ms. O'Neal's doctor explaining that an additional medical issue (the car accident) prevented her from returning to work or being "reasonably accommodated in [her] position as a Security Officer for an indefinite timeframe . . . ."[129]   The letter asserted that further extension of medical leave without any understanding of how long the leave would last would create "an undue hardship on the LRSD."[130]

---

[122] *Id.* ¶ 21.

[123] Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 53:5–18.

[124] *Id.* at 59:24–60:25.

[125] *Id.* at 60:17–25.

[126] *Id.* at 53:8–24.

[127] Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 14-2).

[128] *Id.* at 1.

[129] *Id.*

[130] *Id.* at 1–2.

Ms. Eason asked for Ms. O'Neal to submit a letter of resignation within 48 hours of receiving the letter, otherwise the LRSD would proceed with termination of Ms. O'Neal's employment.[131]

On August 29, 2017, LRSD Superintendent of Schools Mike Poore sent a letter to Ms. O'Neal to notify her of his recommendation to terminate her employment with the LRSD.[132]  He stated that the reason for his recommendation to terminate was "due to [her] inability to return to work after an extended medical leave of absence . . . ."[133]  Mr. Poore listed sixteen points of evidence to support his recommendation:

1. On March 7, 2016, you requested leave under the Family and Medical Leave Act (FMLA) for your own serious health condition beginning on March 31, 2016 through June 3, 2016.  According to your physician, an estimated 2.5-3 months of home recovery time was expected following your surgery.

2. On April 21, 2016, you provided an update from your physician stating you should remain out of work until August 1, 2016.  Your first contracted day for the 2016-2017 school year was August 9, 2016.

3. On July 21, 2016, you provided Human Resources with an additional update from your physician stating that you were still recovering and making progress and were requesting an additional three months of medical leave until your next appointment on October 20, 2016.

4. Your medical leave extension request was designated as leave under the FMLA for the dates beginning on August 9, 2016 through August 29, 2016.  As of August 29, 2016, your FMLA eligibility of 12 weeks or 60 days within a 12-month period was exhausted.

5. Due to your request for an extension of your medical leave being through October 20, 2016 and to assist you in fully recovering from your serious health condition, the LRSD designated your extension request as a reasonable accommodation under the Americans with Disabilities Act (ADA), as amended by the ADA Amendments Act (ADAAA), for the dates beginning on August 30, 2016 through October 21, 2016, a total of 8 additional weeks beyond your FMLA exhaustion.

6. On October 13, 2016, you provided an update from your physician which

---

[131] *Id.* at 2.

[132] Ex. 3 to Defs.' Mot. for Summ. J. (Doc. 14-3).

[133] *Id.* at 1.

included the following statements:

   a.  It is my medical opinion that Ms. Melodi O'Neal should remain
       out of work until – indefinitely.

   b.  She has shortness of breath with any activities relating to her line
       of work.

   c.  She . . . has significant difficulty breathing with any exertion.

7.  During the week of October 17, 2016, you were contacted by Human Resources
    to discuss the LRSD's inability to extend your medical leave further under the
    ADA as there was no indication that you were making or have made enough
    progress to be able to be safely accommodated in your position as a security
    officer nor was there a proposed timeframe for any additional recovery efforts.

8.  After requesting more time to revisit your doctor and provide additional
    information, Human Resources sent the LRSD Interactive Process
    Questionnaire to you on October 25, 2016 to complete and which you returned
    on November 11, 2016.  The questionnaire completed by your physician again
    stated "patient should remain out of work until – indefinitely"; however, it was
    indicated you needed an additional extension through January 9, 2017.

9.  Your request for a continuous leave extension as a reasonable accommodation
    under the ADA was again granted beginning on October 24, 2016 through
    January 6, 2017, which would provide you with 11 additional weeks to assist
    you in your recovery and ability to return to work.  A total of 19 additional
    weeks under the ADA were provided to you beyond your 12 weeks FMLA
    eligibility.

10. Following an additional interactive process meeting with you on March 6,
    2017, a decision was made to again extend your medical leave as a reasonable
    accommodation under the ADA for the dates beginning on January 9, 2017
    through March 17, 2017, an additional 11 weeks including spring break,
    totaling 30 weeks of a continuous medical leave extension under the ADA
    beyond your 12 week FMLA eligibility.

11. On May 19, 2017, Human Resources received an update from your physician
    stating that you have recovered from your surgery and were able to go back to
    work.  The update noted that you would still have some issues with shortness
    of breath when you exert yourself causing the limitations of some of your
    activities; however, it was believed that you would be able to return starting in
    the Fall of 2017.  Therefore, a decision was again made to extend your medical
    leave as a reasonable accommodation under the ADA for the dates beginning
    on March 27, 2017 through May 31, 2017, an additional 9.5 weeks totaling 39.5
    weeks of a continuous medical leave extension under the ADA beyond your 12
    week FMLA eligibility and reaching the end of the 2016-2017 school year.

12. On July 13, 2017, Human Resources reached out to you concerning your medical leave update final review meeting before the beginning of the 2017-2018 school year confirming you are able to perform the essential functions and what, if any, reasonable accommodations you were requesting to meet the physical demands required as a security officer.

13. On July 20, 2017, Human Resources was informed that you were in a vehicle accident on June 27, 2017 and currently under doctor's care with back injuries.

14. After receiving two new updates from your physician, including the statement "unable to return to work until further notice", a decision was made at the conclusion of your interactive process meeting that unfortunately the LRSD will not be able to further extend your medical leave at this point without causing a continual undue hardship on the District.  At the conclusion of the meeting, it was determined:

   a. It would be unreasonable and pose an undue hardship to extend your request for an extension of your medical leave as a reasonable accommodation under the ADA as a security officer beyond the date of May 31, 2017 due to you having been provided with a continuous medical leave of 16 consecutive months, which includes two summer seasons; and

   b. the LRSD would be unable to reasonably accommodate you as a security officer without jeopardizing your own health and safety as well as the safety of the students and employees at Central High School.

15. On August 25, 2017, you received a letter from Human Resources asking that you consider submitting a resignation of employment within 48 hours of your receipt of the letter.  By way of text message, you confirmed receipt of the letter sent to you and requested one additional day to get back with Human Resources concerning your resignation.

16. You did not submit your resignation of employment on or about August 23, 2017.  As explained to you in the letter dated August 25, 2017, you were informed the LRSD would move forward with the process of your separation of employment in the absence of your ability to return to work with or without accommodations or your resignation.[134]

---

[134] *Id.* at 1–3.  The Court notes that Mr. Poore's letter states that Ms. Eason's letter was dated August 25, 2017. Because the record establishes that Ms. Eason's letter was dated August 15, 2017, the date of August 25, 2017 is likely a typo.  *See* Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 14-2) at 1.

At the conclusion of his letter, Mr. Poore stated that Ms. O'Neal was entitled to a hearing if she desired one.[135]

After receiving that letter, Ms. O'Neal requested a personnel hearing, which took place on October 12, 2017.[136]   After the personnel hearing, the Community Advisory Board deliberated about Mr. Poore's recommendation to terminate Ms. O'Neal's employment.[137]   The Board determined as true each of the sixteen points that Mr. Poore listed as evidence of Ms. O'Neal's inability to return to work.[138]   The Board voted five to zero in favor of upholding Mr. Poore's recommendation to terminate Ms. O'Neal's employment "for Ms. O'Neal's inability to return to work after an extended medical leave of absence."[139]   On October 20, 2017, Commissioner of Education Johnny Key accepted the Board's recommendation, and Ms. O'Neal's employment with the LRSD was "terminated effective immediately as a result of the sixteen true finding determinations made by the Board."[140]

## II. Discussion

A court shall grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.[141]   The moving party has the burden to show that (1) there is an absence of a genuine dispute of material fact on at least one essential element of the nonmoving party's case and (2) the absence means that a rational juror could not possibly find for the nonmoving party on that essential element of the nonmoving party's

---

[135] Ex. 3 to Defs.' Mot. for Summ. J. (Doc. 14-3) at 3–4.

[136] Ex. 4 to Defs.' Mot. for Summ. J. (Doc. 14-4) at 1.

[137] *Id.*

[138] *Id.* at 1–4.

[139] *Id.* at 1.

[140] Ex. 5 to Defs.' Mot. for Summ. J. (Doc. 14-5) at 1.

[141] *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citing FED. R. CIV. P. 56(c)(2)).

case.[142]  Conversely, if the nonmoving party can present specific facts by "affidavit, deposition, or otherwise, showing the existence of a genuine issue for trial," then summary judgment is not appropriate.[143]  Importantly, "[t]he mere existence of a factual dispute is insufficient alone to bar summary judgment . . . ."[144]  The dispute of fact must be both genuine and material to prevent summary judgment.[145]  A genuine dispute of fact exists where a rational juror could decide the particular question of fact for the nonmoving party.[146]  A material dispute of fact exists where the juror's decision on the particular question of fact determines the outcome of a potentially dispositive issue under the substantive law.[147]

The Court is going to grant summary judgment in favor of the Defendants on all counts. It does so for the reasons discussed below.

## A.  *Individual Liability*

Ms. O'Neal concedes that summary judgment is appropriate on the ADA, ACRA, and RA claims to the extent that they are brought against Mr. Self and Ms. Eason in their individual capacities.[148]  This concession makes sense because those laws prohibit "employers" from taking certain actions.  As defined in those laws, the LRSD is the employer here as opposed to Mr. Self and Ms. Eason in their individual capacities.  To the extent any of Ms. O'Neal's ADA, ACRA, or

---

[142] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[143] *Grey v. City of Oak Grove, Mo*., 396 F.3d 1031, 1034 (8th Cir. 2005).

[144] *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

[145] *Id.*

[146] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[147] *Id.*

[148] Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 25-1) at 2.

RA claims may proceed, they will proceed only against the Defendants in their official capacities, which essentially means the claims proceed only against the LRSD.[149]

### B. *Failure to Promote as Discrimination Under the ADA, RA, and ACRA.*

The ADA makes it unlawful for employers to discriminate against any "qualified individual on the basis of disability."[150] "To establish discrimination under the ADA, an employee must show that she (1) is disabled within the meaning of the ADA,[151] (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment action because of her disability."[152] The parties agree that Ms. O'Neal is disabled.[153] Defendants do not contest Ms. O'Neal's argument that she suffered an adverse employment action when she was not given the mobile-patrol position. That leaves two questions: whether Ms. O'Neal was a qualified individual under the ADA and whether the adverse employment action was because of her disability.

A qualified individual must possess the requisite skill and training for a position and "be able to perform the essential job functions, with or without reasonable accommodation."[154] "Essential functions of a position are the fundamental duties of the job" as opposed to "its marginal

---

[149] In their Motion for Summary Judgment, Defendants do not argue that summary judgment should be granted on the FMLA claims because of this definition-of-employer issue. This is likely because Eighth Circuit precedent acknowledges that FMLA claims may be brought against individual supervisors. *See Darby v. Bratch*, 287 F.3d 673, 680–81 (8th Cir. 2002). In any event, because Defendants do not raise the issue, the Court will not address it.

[150] 42 U.S.C. § 12112(a); *see Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1107 (8th Cir. 2016).

[151] Similarly, the RA proscribes discrimination against an "otherwise qualified individual with a disability …, solely by reason of her or his ability." *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013) (quoting 29 U.S.C. § 794). Because decisions interpreting the two statutes are "interchangeable," *id.*, the Court's analysis of Ms. O'Neal's ADA claims is equally applicable to her RA claims. Ms. O'Neal's ACRA claims are also analyzed under the same framework as the ADA. *See Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002) (collecting cases supporting the proposition that courts analyze disability claims under ACRA under the same principles as claims brought under the ADA).

[152] *Walker*, 737 F.3d at 1216.

[153] Nov. 24, 2020 Hr'g Tr. at 53.

[154] *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003).

functions."[155]  The Eighth Circuit has been clear that an "employer's judgment" about an essential job function is "highly probative."[156]  This is not surprising because "much of the information which determines those essential functions lies uniquely with the employer."[157]

Of course, a determination of whether and which physical qualifications are essential to a particular job "should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved."[158]  Governing regulations counsel the consideration of:

> (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.[159]

Eighth Circuit precedent is generally in accord, holding that "it is the written job description, the employer's judgment, and the experience and expectations of [workers in the position at issue] which establish the essential functions of the job."[160]  The Eighth Circuit, however, also adds an important ingredient to the mix: a job function can be essential even if it is rarely performed.  It is "the potential" need for the function that counts, especially where "it is difficult for the [employer] to describe with precision exactly what [an employee] will encounter" on any given day.[161]  Indeed, the Eighth Circuit holds "that a task may be an essential function even if [an] employee performs

---

[155] *Walker*, 737 F.3d at 1217.

[156] *Duello v. Buchanan Cty. Bd. Of Sup'rs*, 628 F. 3d 968, 972 (8th Cir. 2010).

[157] *Walker*, 737 F.3d at 1217 (quoting *Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012)).

[158] *Benson v. Nw. Airlines*, 62 F.3d 1108, 1114 (8th Cir. 1995) (quoting *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988)).

[159] 29 C.F.R. § 1630.2(n)(3); *see Walker*, 737 F.3d at 1217.

[160] *Dropinski v. Douglas Cty., Neb.*, 298 F.3d 704, 709 (8th Cir. 2002).

[161] *Id.* at 708–709.

it for only a few minutes each week, and even if other employees are available to perform the task for the disabled employee."[162]  That's one reason why the Eighth Circuit caselaw concludes that an employee's "specific personal experience is of no consequence in the essential functions equation."[163]

All parties and the Court agree that the questions of what constitute the essential functions of the mobile-patrol position and whether Ms. O'Neal could perform those functions are questions of fact.[164]  And certainly each side takes a different position on both of these questions.  The problem for Ms. O'Neal, however, is that, based on the record evidence in this case, no rational juror could conclude that Ms. O'Neal could fulfill the essential functions of the mobile-patrol position.

Recall that the mobile-patrol positions first came open in May of 2016.  Ms. O'Neal was placed under severe restrictions from her doctor beginning April 1, 2016, over a month before she first applied for the mobile-patrol position.  From that point on, she was never medically cleared to return to work.[165]  Her doctor was clear that she could not perform her role as a security officer. He said she was medically unable to climb stairs and intervene in altercations.  Ms. O'Neal testified that her November 11, 2016 interactive process questionnaire, which Dr. Steliga completed, indicated that she could not perform the essential functions of her security officer position.[166]  Her argument is that she could perform the essential functions of the mobile-patrol position, which she

---

[162] *Minnihan v. Mediacom Comms. Corp.*, 779 F.3d 803, 812 (8th Cir. 2015).

[163] *Dropinski*, 298 F.3d at 709.

[164] *See Faidley v. United Parcel Serv. of Am., Inc.*, 889 F.3d 933, 941 (8th Cir. 2018) (en banc) (stating that what comprises essential functions is a "fact-intensive issue, which turns on factors such as the employer's judgment, its written job description . . . and the consequences of not requiring the incumbent to perform the function").

[165] As discussed in the Background section above, in March of 2017, her lung doctor cleared her to return to work beginning in August of 2017.  However, after her car wreck in June of 2017, she was once again restricted from work indefinitely.

[166] Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 33:15–23.

claims are different than the essential functions of the security officer position.  But all the record evidence points in one direction: the essential functions of the mobile-patrol position overlap with the essential functions of the security position, at least with respect to the ability to quickly respond to events on school grounds and intervene in altercations.[167]   Indeed, one of the primary responsibilities of the mobile-patrol position was to assist the school-based officers with their duties.

The job description for the mobile-patrol position listed basic qualifications and requirements.  Among these was a requirement that applicants "meet the physical requirements of the job and possess the ability to work in all environmental conditions to perform common security functions and duties."[168]  Mobile-patrol officers were required to transport students who were behavior problems; protect individuals and property from harm; proactively prevent any incidents from occurring at bus stops; cooperate with and assist other officials at the scene of a problem; and assist school security officers in the conducting of safety and security related issues.[169]

The above is—to say the least—consistent with the LRSD's judgment that essential functions of the mobile-patrol position included quickly mobilizing to (*e.g.* running and climbing stairs when arriving at a school) and intervening in physical incidents or altercations.  Mr. Self, the Director of Safety and Security for the LRSD, testified that mobile-patrol officers function much like normal security officers.[170]  The mobile-patrol officers, according to Mr. Self, respond to calls to bus stops for "parents fighting, kids fighting, anything you can imagine."[171]  Even Ms.

---

[167] Ms. O'Neal testified that mobile-patrol officers are called to schools to assist with altercations and that when these officers arrive at the school, they need to be able to quickly move to the altercation.  Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 88–89.

[168] Ex. D to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-6) at 15.

[169] *Id.* at 16.

[170] Ex. B to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-4) at 41:1–7

[171] *Id.* at 40:10–12.

O'Neal concedes that mobile-patrol officers are required to respond to altercations and "assist in breaking up [altercations] between students."[172]

Given all of this, it is impossible to see how a rational juror could conclude anything but that quickly mobilizing to and intervening in physical altercations are essential functions of the mobile-patrol position, just like they are essential functions of the school-based position. Undisputed evidence clearly shows that Ms. O'Neal's doctor said she couldn't perform the security officer position. Indeed, Ms. O'Neal has never contended that, in the relevant time frame, she could quickly mobilize to or intervene in physical altercations. So, it is similarly impossible to see how a rational juror could conclude anything but that Ms. O'Neal could not perform at least two of the essential functions of the mobile-patrol position.

Ms. O'Neal's counterarguments are not particularly persuasive. First, without citing to the record, she argues that "Plaintiff has established that the mobile unit mostly required driving around to various locations, such as bus stops and elementary schools, filling out paperwork, dealing with parents, and only occasionally going to a middle school or high school."[173] From this, she argues that she "has established" that things like running, climbing stairs, or engaging in altercations "are marginal" functions "rather than being essential."[174] This argument runs headlong into the Eighth Circuit's decisions in *Dropinski* and *Minnihan*, which (as discussed above) make clear that a job function can be essential even if it is rarely performed or required.

Second, although perhaps relatedly, Ms. O'Neal points to a number of security officers and

---

[172] Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 88:13–89:25.

[173] Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 25-1) at 6.

[174] *Id.* Ms. O'Neal's Brief also states in this section that the LRSD does "not require security officers to run, climb stairs, or engage in altercations." *Id.* However, given that her deposition testimony essentially contradicts this point, and given her concession that these functions are at least a marginal (not non-existent) part of the job, the Court understands her ultimate point to be that these functions don't often need to be performed.

mobile-patrol officers who she and her husband (a security supervisor at a school in the LRSD) say are "fat," "could not fight," have "no muscle tone," have "a limp," cannot run," have "trouble walking," and "sit[] there eating popcorn and drinking coke."[175]   There's more that's said about other officers.  But the gist is that Ms. O'Neal believes quickly mobilizing to and intervening in physical altercations can't really be an essential job function given the fact that the LRSD employs mobile-patrol officers and security officers who can't do this type of work.  It is not at all clear that Ms. O'Neal or her husband have the personal knowledge necessary to opine on the abilities of each of the officers they identify.[176]  But even putting that problem aside, whether some mobile-patrol officers and some security officers had trouble performing the essential functions of the job is not evidence of what the essential functions are.  It would be one thing if Ms. O'Neal produced evidence that all, nearly all, or even a majority of the security officers never engaged in physical altercations because of some physical inability.  But without this type of global picture, anecdotal evidence of the sort she has produced is essentially meaningless.  As the Eighth Circuit makes clear, "specific personal experience is of no consequence in the essential functions equation."[177]

In any event, a close review of Ms. O'Neal's "evidence" regarding other officers actually reinforces the LRSD's position on essential functions.  For example, consider the affidavit of Mr. O'Neal.  Mr. O'Neal acknowledges that he requested that a particular mobile-patrol officer no longer come to his school because "when there was a fight or dispute, she would not intervene or

---

[175] Ex. C to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-5) at 1; Ex. D to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-6) at 1.

[176] For example, in Ms. O'Neal's deposition, she admitted to not having personal knowledge of the cardio-pulmonary function of a number of the individuals she identifies. Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 92–101.

[177] *Dropinski*, 298 F.3d at 709. Ms. O'Neal's argument has another problem.  It proves too much.  Most of the individuals that she and her husband identify are not mobile-patrol officers; they are school security officers.  But she conceded that she couldn't perform the essential functions of a school security officer, in part because they involved activities like running and intervening in altercations.

do anything."[178]  That statement is consistent with the notion that a mobile-patrol officer who does not intervene in disturbances isn't fulfilling the essential functions of the job.  Indeed, Mr. O'Neal's affidavit is full of vignettes that either expressly or implicitly acknowledge that a routine part of the job of security officers and mobile-patrol officers is to quickly respond to and intervene in physical altercations.[179]

Third, Ms. O'Neal also contends that the lack of a physical fitness test for the mobile-patrol position establishes that "stairs, running, and fighting are not essential apparently."[180]  Mr. Self testified that there was a physical fitness test.[181]  It is true that only new hires had to pass the test.[182] In any event, Ms. O'Neal's physical-fitness-test argument is a red herring.  An employer does not need to explicitly test an applicant's ability to perform every essential function.  That current LRSD officers were not required to pass a physical fitness test does not change the Court's finding that physicality is an essential function of the mobile-patrol position.

Fourth, Ms. O'Neal points to a statement that Mr. Self made at his deposition as evidence that she was "qualified for the job."[183]  To the extent she is arguing that Mr. Self's statement suggests that she could perform the essential functions of the mobile-patrol position, she is taking Mr. Self's testimony out of context and mischaracterizing it.  Mr. Self testified that she, along with others, were "basic qualified" for the position.[184]  In context, it is clear that Mr. Self was talking

---

[178] Ex. C to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-5) at 2.

[179] *Id.* ¶ 2 (explaining that one officer was "no longer com[ing] to [Mr. O'Neal's] school, having asked not to because there are too many fights and he can't handle it"); *id.* ¶ 4 (noting that one officer "could not fight" and that "[i]t was a common complaint that she would not respond to calls"); *id.* ¶ 5 (noting that one officer is "so slow, that he cannot timely respond to a call" and "[t]he fights we have would all be over by the time he got there").

[180] Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶ 5.

[181] Ex. B to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-4) at 12–13.

[182] *Id.* at 13:19–22.

[183] Pl.'s Resp. to Statement of Facts (Doc. 25-2) Add'l Statement of Facts at ¶ 11.

[184] Ex. B to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 25-4) 44:16–45:3.

about her credentials and experience, not whether she could perform the physical requirements of the job with the disability she had developed.

For all the foregoing reasons, there is no evidence from which a rational juror could conclude that Ms. O'Neal could perform the essential functions of the mobile-patrol position without a reasonable accommodation.  Of course, this is not the end of the story.  Ms. O'Neal could still be a qualified individual if there was a reasonable accommodation that could have allowed her to perform the essential functions of the mobile-patrol position.  But on this record no rational juror could conclude that such an accommodation exists.  The Eighth Circuit has made clear that "an employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee."[185]   And Ms. O'Neal has not presented any reasonable accommodation that would allow her to perform the essential functions of the mobile-patrol position.  Indeed, to accommodate Ms. O'Neal in the mobile-patrol position, the LRSD would have had to strip that position of essential functions of the job.  Neither the ADA nor the Eighth Circuit requires employers to do that.

In sum, because a rational juror could not conclude that Ms. O'Neal was a qualified individual, her discrimination claims necessarily fail.[186]   The Court therefore grants summary judgment to Defendants on Ms. O'Neal's ADA, RA, and ACRA discrimination claims as they relate to her not receiving an interview for the mobile-patrol position.

### C.  *Failure to Reasonably Accommodate under the ADA and RA*

---

[185] *Dropinski*, 298 F.3d at 709–10.

[186] The record reflects that the LRSD offered Ms. O'Neal other positions within the school district, which Ms. O'Neal declined to pursue.  Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 60.

Ms. O'Neal alleges that the LRSD's failure to accommodate her disability violated the ADA and the RA.  To survive summary judgment on this claim, Ms. O'Neal "must first make a facial showing that [she] has an ADA disability and that [she] has suffered [an] adverse employment action.   Then [she] must make a facial showing that [she] is a 'qualified individual.'"[187]  As stated above, Ms. O'Neal cannot establish that she was a qualified individual for either the security officer position she held or for the mobile-patrol position she sought.  As a result, she cannot survive summary judgment on this claim.

In any event, the record evidence is undisputed that the LRSD engaged in an interactive process to attempt to accommodate Ms. O'Neal's disability.  Ms. O'Neal is the one who made clear that there were no reasonable accommodations that would allow her to continue in her security officer role.  The accommodation she wanted (and the only one she appeared willing to accept) was the mobile–patrol position.  But, as described above, she could not perform several essential functions of that position.  In the Eighth Circuit, a "reasonable accommodation" does not include giving an employee a new job if they cannot perform essential functions of the new job.[188]

Ms. O'Neal acknowledges that her principal reasonable accommodation claims are about not getting the mobile-patrol position.[189]  Her Complaint also raises a failure to reasonably accommodate claim in connection with her termination. But it appears that this claim is entirely derivative of the mobile-patrol-position claim.  Ms. O'Neal's argument seems to be that if she had been given the mobile-patrol position as a reasonable accommodation in the summer of 2016, she

---

[187] *Brannon v. Luco Mop Co.*, 521 F.3d 843, 848 (8th Cir. 2008) (quoting *Fenney*, 327 F.3d at 712).

[188] *See Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 1011, 1019 (8th Cir. 2000) ("Importantly, [an] employee must be otherwise 'qualified' for [a] reassignment position.").

[189] Nov. 24, 2020 Hr'g Tr. at 31.  In response to the Court's question as to what Ms. O'Neal's claims were, Ms. O'Neal's counsel stated that "[T]he first thing I would say is that this is really about the denial of the mobile unit jobs in summer and I think into the fall of 2016.  It's not about them not returning to work in the summer of 2017." *Id.*

would not have had to use a year of leave and therefore would not have been terminated when her 2017 car accident resulted in the need for indefinite leave.[190]   To the extent that her termination claim is derivative of her mobile-patrol-position claim, it cannot survive summary judgment because the underlying claim does not survive summary judgment.

To the extent her termination claim stands on its own, no rational juror could rule in her favor on such a claim.  The record is undisputed that the LRSD gave Ms. O'Neal extended time off from her security officer role as a reasonable accommodation.  The record is also clear that Ms. O'Neal was on "indefinite leave" at the time she was terminated.[191]   The Eighth Circuit has held that "employers should not be burdened with guess-work regarding an employee's return to work after an illness."[192]   At the time of her termination, the LRSD could not provide a reasonable accommodation without being able to see into the future to determine when, if ever, Ms. O'Neal could return to work in any capacity.  The ADA does not require employers to become oracles to satisfy their duties under that law.[193]

For the foregoing reasons, the Court grants summary judgment to the Defendants on Ms. O'Neal's failure to accommodate claims.

## D.  *Retaliation under the ADA, RA, and ACRA*

The ADA protects employees from retaliation by their employers if the employee "has opposed any act or practice made unlawful by this chapter or because such individual made a

---

[190] *See* Pl.'s Resp. to Statement of Facts (Doc. 25-2) at ¶¶ 4–8, 10–16, 20–29.

[191] Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 41:15–42:2.

[192] *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 903 (8th Cir. 2009).

[193] *Id.* ("Employers are not qualified to predict the degree of success of an employee's recovery from an illness or injury.  To afford … protections of the ADA during the early stages of … recuperation from surgery, …would be to burden [the employer] with the duty to see into the future.  We do not believe that such was the intent of Congress in passing the ADA.") (quoting *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 (8th Cir. 1999)).

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."[194]  To get over the summary judgment hill on a retaliation claim, a plaintiff must produce some "direct evidence of retaliation" or rely on an inference of retaliation created under the *McDonnell Douglas* burden-shifting framework.[195]  Under that framework, to make out a prima facie case, a "plaintiff must show that (1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her, and (3) there was a causal connection between the adverse action and the protected activity."[196]  "If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show a 'non retaliatory reason for the adverse employment action.'"[197]  If the defendant does that, the burden returns to the plaintiff to show "evidence that (1) creates a question of fact as to whether [defendant's] reason was pretextual and (2) creates a reasonable inference that [defendant] acted in retaliation."[198]

Ms. O'Neal argues that there is direct evidence that she did not get the mobile-patrol position because she complained of disability discrimination to both an LRSD HR official and the EEOC.  For purposes of this motion, the Court assumes both actions constituted protected activity and that not getting the mobile-patrol position constituted an adverse employment action.  "Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse

---

[194] *Walker*, 737 F.3d at 1218 (quoting 42 U.S.C. § 12203(a)).  The Eighth Circuit recognizes retaliation as a cause of action under both the ADA and the RA, and it treats retaliation claims under the ADA and the RA interchangeably.  *See id.* ("This circuit also has recognized a cause of action for retaliation under the Rehabilitation Act, although the textual basis for the claim is not well explained in our cases.  In any event, our precedent says that we treat retaliation claims under the two statutes interchangeably.") (internal citation omitted).  Additionally, "ACRA claims are analyzed under the same principles as ADA claims."  *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F. 3d 911, 921 n.6. (8th Cir. 2018) (quoting *Alexander v. E. Tank Servs., Inc.*, 2016 Ark. App. 544, at 10, 505 S.W.3d 239, 245).

[195] *E.E.O.C. v. Prod. Fabricators, Inc*., 763 F.3d 963, 972 (8th Cir. 2014).

[196] *Walker*, 737 F.3d at 1218.

[197] *Lors v. Dean*, 746 F.3d 857, 867 (8th Cir. 2014) (quoting *Green v. Franklin Nat. Bank of Minneapolis*, 459 F.3d 903, 914 (8th Cir. 2006)).

[198] *Id.* (quoting *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005)).

32

action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse-action was in retaliation for the protected conduct."[199]

As discussed in the background section above, Ms. O'Neal testified that, during an interactive process meeting with Ms. Eason and Mr. Self, Mr. Self told Ms. O'Neal that he did not allow her to interview for the patrol officer positions because of her disability.[200]  In various interactive meetings, Mr. Self also made several references to Ms. O'Neal about how he did not understand what was "wrong with [her.]"[201]  Mr. Self asked, "if [Ms. O'Neal] was punched in the chest, would [she] simply cave in and fall down?"[202]  Mr. Self certainly could have chosen a better way to express himself.  But his comments are not direct evidence of retaliation or retaliatory intent.  No rational juror could conclude otherwise.  Mr. Self's comments make no mention of Ms. O'Neal's discrimination reports.  All his comments are geared toward evaluating Ms. O'Neal's ability to perform the physical requirements for either the security officer position or the mobile-patrol position.  Because the Court finds that no direct evidence links Ms. O'Neal's not receiving the mobile-patrol position and her engaging in protected conduct, the Court turns to the *McDonnell Douglas* test.

Ms. O'Neal has not produced evidence that would allow a rational juror to conclude that there was a causal connection between her protected reporting and her not getting the mobile-patrol position.  Ms. O'Neal first applied for the mobile-patrol position in May 2016.[203]  She applied again in June 2016.[204]  It is undisputed that she did not get an interview based on either

---

[199] *Id.* at 865.

[200] Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 14-1) at 51:1–12.

[201] *Id.* at 86:10–14.

[202] *Id.*

[203] *Id.* at 49:3–9.

[204] *Id.*

application.   Importantly, Ms. O'Neal did not make any claim of disability discrimination (protected activity) until June 22, 2016, when she contacted a LRSD human resources representative.[205]  To be clear, then, Ms. O'Neal was denied an interview for the mobile-patrol position before she ever engaged in protected activity.  The Eighth Circuit makes clear that "alleged retaliation which precedes protected conduct cannot logically be used to show causation because a prior event cannot be caused by a later event."[206]  And it is not like she was re-scored or re-evaluated every time she applied.  While it is true that Ms. O'Neal was also denied interviews after her protected reporting, no rational juror could casually connect those denials to her protected reporting.  The undisputed evidence is that the LRSD acted the same way after the protected reporting as it acted before the protected reporting.  There's no evidence of any course change from the LRSD because of the reporting.

Ms. O'Neal cannot satisfy her prima facie burden.  No rational juror could conclude otherwise.  Accordingly, the Court grants summary judgment to Defendants on Ms. O'Neal's ADA, RA, and ACRA retaliation claims.

### E.  *Retaliation under the FMLA*

Ms. O'Neal's FMLA retaliation claim cannot survive summary judgment.  Without direct evidence of retaliation, courts analyze FMLA claims under the *McDonnell Douglas* burden-shifting framework.[207]  "To establish a prima fac[i]e case of FMLA retaliation, [Ms. O'Neal] 'must show that: 1) she engaged in protected conduct; 2) she suffered a materially adverse employment action; and 3) the materially adverse action was causally linked to the protected conduct.'"[208]

---

[205] *See supra* note 54.

[206] *Stewart v. Independent School Dist. No. 196*, 481 F.3d 1034, 1044 (8th Cir. 2007).

[207] *Sisk v. Picture People, Inc.*, 669 F.3d 896, 899 (8th Cir. 2012).

[208] *Id.* at 900 (quoting *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011)).

Thus, to defeat summary judgment, Ms. O'Neal must make a facial showing that she exercised her FMLA rights, she suffered an adverse employment action, and that there was a causal connection between her exercise of rights and the adverse employment action.

Ms. O'Neal argues that Mr. Self's comments constitute direct evidence of FMLA retaliation. In this context, direct evidence would expressly show a link between the FMLA leave and an adverse employment decision. Put another way, it would be evidence that showed that the decision not to interview Ms. O'Neal (and ultimately not to give her the job) was at least in part motivated by the fact that Ms. O'Neal took FMLA leave. Mr. Self's unfortunate comments don't fit the bill. The comments were about the effect of Ms. O'Neal's disability itself, not about her taking FMLA leave. Ms. O'Neal's argument essentially collapses the distinction between disability discrimination and FMLA retaliation. In short, Mr. Self's comments are not direct evidence of retaliation or retaliatory intent. No rational juror could conclude otherwise. As a result, the Court turns to the *McDonnell Douglas* test.

Ms. O'Neal meets the first two elements of her prima facie case: she took FMLA leave and she didn't get the mobile-patrol position. But Ms. O'Neal fails to produce or point to any record evidence that would allow a rational juror to find a causal connection between the LRSD's decision not to interview Ms. O'Neal and Ms. O'Neal taking FMLA leave. Ms. O'Neal's strongest argument is that the temporal proximity between the date she took leave (March 31, 2016) and the time she was denied an interview (May 16, 2016 at the earliest) raises the inference that the LRSD's decision was motivated by her leave. Eighth Circuit precedent, however, requires more than temporal proximity to get past summary judgment in a case like the one at bar. "Generally, more than a temporal connection between the protected conduct and the adverse employment

action is required to present a genuine factual issue on retaliation."[209]   "[F]or temporal proximity alone to be sufficient, 'the temporal proximity must be very close.'"[210]   The Eighth Circuit has held that a period of two weeks between protected activity and an adverse employment action was close enough, "but barely so."[211]   The Eighth Circuit has also held that one month between protected activity and an adverse employment action was not close enough.[212]

The Eighth Circuit "looks to the date an employer knew of an employee's use . . . of FMLA leave, not the date it ended."[213]   The time between Ms. O'Neal taking FMLA leave and the LRSD's decision not to interview her was at least a month and a half.[214]   So something more is necessary. The only thing Ms. O'Neal could arguably point to here is Mr. Self's comments.   But, as discussed above, those comments are not about FMLA leave and do not raise the specter of retaliation for taking FMLA leave.   Ms. O'Neal has failed to establish a causal nexus between her FMLA leave and the LRSD's hiring decision.   No rational juror could conclude otherwise.   The Court therefore grants summary judgment to the Defendants, both in their individual and official capacities, on Ms. O'Neal's FMLA retaliation claims as they relate to the mobile-patrol position.

## F.   *Termination as Disability Discrimination under the ADA, RA, and ACRA*

Ms. O'Neal contends that the LRSD terminated her because of her disability.   To get past summary judgment on this claim, Ms. O'Neal must produce evidence that would allow a rational juror to conclude that "she (1) is disabled within the meaning of the ADA, (2) is a qualified

---

[209] *Id.* (quoting *Kiel v. Select Artificials, Inc.* 169 F.3d 1131, 1136 (8th Cir. 1999)).

[210] *Id.* (quoting *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006)).

[211] *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir.2002).

[212] *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1088 (8th Cir. 2010).

[213] *Sisk*, 669 F.3d at 900.

[214] This time is based on the date Ms. O'Neal's FMLA leave began, March 31, 2016, and the date the mobile-patrol position was first posted, May 15, 2016.  Of course, it is likely that more time passed between the job posting and the time an actual decision was made, but for the purposes of summary judgment the Court is using this time span.

individual under the ADA, and (3) has suffered an adverse employment action because of her disability."[215]  Ms. O'Neal can show a disability and an adverse employment action.  But, as with Ms. O'Neal's other disability discrimination claims, this claim fails because no rational juror could conclude that Ms. O'Neal could perform the essential functions (the ability to quickly mobilize to and intervene in physical altercations) of either the position she held at the time of her termination or the mobile-patrol position.

Moreover, Ms. O'Neal cannot present evidence that she could have performed arguably the most essential function of any job: the ability to show up.  Recall that it is undisputed that Ms. O'Neal missed the entire 2016-17 school year, and, because of her June 2017 car wreck, she could not tell the LRSD when (or whether) she could (or would) ever return to work.  The LRSD ended up giving Ms. O'Neal over 39 weeks of leave as a reasonable accommodation under the ADA in addition to the 12 weeks of FMLA leave she used.  Additionally, indefinite leave was not reasonable.  The Eighth Circuit, unsurprisingly, holds that "regular attendance at work is an essential function of employment."[216]  Consequently, no rational juror could conclude that Ms. O'Neal was a qualified individual under the ADA.  The Defendants are entitled to summary judgment on Ms. O'Neal's disability discrimination claims related to her termination.

### G.  *Termination as Failure to Accommodate under the ADA and RA*

Likewise, Ms. O'Neal's failure-to-accommodate claim fails for the same reasons stated in the preceding section.  To make out a prima facie case of failure to accommodate, Ms. O'Neal must put on at least some evidence that she was a "qualified individual" under the ADA.  For the

---

[215] *Walker*, 737 F.3d at 1216.  As mentioned above, claims brought under the RA and the ACRA are analyzed under the same framework as claims brought under the ADA.  *See supra* note 194.

[216] *Luco*, 521 F.3d at 849; *see also Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 544 (8th Cir. 2018).

reasons already discussed above, no rational juror could conclude that Ms. O'Neal was a qualified individual under the ADA and RA. The Court therefore grants summary judgment to Defendants on Ms. O'Neal's failure-to-accommodate claim as it relates to her termination.

### H. *Termination as Retaliation under the ADA, RA, and ACRA*

Ms. O'Neal brings retaliation claims related to her termination. Ms. O'Neal's Complaint only references the ADA, RA, and ACRA with respect to her termination.[217] As discussed in section D, the ADA protects employees from retaliation by their employers if the employee "has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . . ."[218] The Court cannot confidently say that it knows what protected activity Ms. O'Neal is relying on for this claim. If it is the protected reporting she made in 2016, then the Court incorporates its analysis and reasoning from section D above to conclude that Ms. O'Neal cannot show a causal relationship between her reporting activity and her termination. If her claim is that she was retaliated against because she requested further leave as a reasonable accommodation under the ADA, no evidence in the record supports a causal relationship between her request and her termination. Thus, summary judgment is appropriate on that theory as well.

Even if Ms. O'Neal could make out a prima facie case, her retaliation claims would still fail. "If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show a 'non-retaliatory reason for the adverse employment action.'"[219] In an August 29, 2017 letter to Ms. O'Neal, Little Rock School District Superintendent Michael Poore enumerated sixteen points

---

[217] Pl.'s Compl. (Doc. 1) ¶¶ 40–45.

[218] *Walker*, 737 F.3d at 1218 (quoting 42 U.S.C. § 12203(a)).

[219] *Lors*, 746 F.3d at 867 (quoting *Green v. Franklin Nat. Bank of Minneapolis*, 459 F.3d 903, 914 (8th Cir. 2006)).

that informed his decision to recommend that Ms. O'Neal be terminated.[220]  The letter chronicled Ms. O'Neal's extended absence from work.[221]  The letter noted that Ms. O'Neal's most recent medical updates included a statement from Ms. O'Neal's physician indicating that Ms. O'Neal was "unable to return to work until further notice."[222]  Upon receiving the letter, Ms. O'Neal requested a personnel hearing in front of the LRSD Community Advisory Board.[223]  At that hearing, the Board announced true findings for each reason Mr. Poore enumerated in the letter.[224]  Johnny Key, the Arkansas Commissioner of Education, accepted the Board's recommendation that Ms. O'Neal be terminated based on her inability to attend work and to provide a reliable date on which she could return.[225]  The LRSD has come forward with a legitimate, non-discriminatory reason for Ms. O'Neal's termination.  An employer has legitimate grounds to part ways with an employee who shows no signs of being able to perform her work on a regular basis.

With the ball back in her court to establish pretext, Ms. O'Neal's only response seems to be that she would not have taken an extended absence had she been given the mobile-patrol position.[226]  Then, her argument continues, because her first absence would have been short, she would have been entitled to additional leave (FMLA or otherwise) after her car wreck and would thus not have been terminated.  Even if all of that were true, it would not constitute evidence of pretext with respect to her termination.  That is, even if the termination was the indirect knock-on

---

[220] Ex. 3 to Defs.' Mot. for Summ. J. (Doc. 14-3) at 1–3.

[221] *Id.*

[222] *Id.* at 3.

[223] Ex. 4 to Defs.' Mot. for Summ. J. (Doc. 14-4) at 1.

[224] *Id.* at 1–4.

[225] Ex. 5 to Defs.' Mot. for Summ. J. (Doc. 14-5).

[226] Pl.'s Resp. to Statement of Facts (Doc. 25-2) ¶¶ 19–28.

result of not getting the mobile-patrol position, that doesn't show that the reason given for termination was pretextual.

Because Ms. O'Neal provides no evidence whatsoever to rebut Defendants' legitimate, non-discriminatory reason for Ms. O'Neal's termination, her retaliation claims cannot move forward to trial.  At bottom, no rational juror could conclude that the LRSD terminated Ms. O'Neal because she engaged in any protected activity.  The Court therefore grants summary judgment to Defendants on Ms. O'Neal's claims as they relate to her termination and retaliation under the ADA, RA, and ACRA.

## I.   *Termination as Retaliation Under the FMLA*

Even if Ms. O'Neal's Complaint asserts a claim that Defendants terminated her employment because she took FMLA leave, this claim would fail.[227]  Recall that, to survive summary judgment, Ms. O'Neal must produce some evidence showing that she exercised her FMLA rights, that she suffered an adverse employment action, and that there was a causal connection between her exercise of rights and the adverse employment action.  Ms. O'Neal has established that she took FMLA leave and was terminated.  This showing satisfies two of the three requisites.  But she provides no evidence upon which a rational juror could conclude that her termination was causally linked to her FMLA leave.  Recall, Ms. O'Neal's FMLA leave began on March 31, 2016 and was exhausted by August 29, 2016.[228]  She was terminated on October 20, 2017—over a year after her FMLA leave ended.[229]  There's nothing to link the two events causally together—certainly not temporal proximity.

---

[227] The Court doubts that Ms. O'Neal brings this claim as Count III of the Complaint does not mention the FMLA.

[228] *See supra* notes 12, 21.

[229] *See supra* note 140.

Ms. O'Neal once again points to Mr. Self's comments about her disability.  As discussed above, those comments aren't about her decision to take FMLA leave.  In any event, Mr. Self did not make the ultimate termination decision.   Ms. O'Neal also falls back on her derivative argument—that is, the termination would not have occurred if she had received the mobile-patrol position in the summer of 2016 and that she didn't receive the mobile-patrol position because of her taking FMLA leave.  This type of derivative argument is not legally sound.  Whether the LRSD terminated Ms. O'Neal as retaliation for taking FMLA leave is a different analytic question from whether the LRSD's earlier decision not to give her the mobile-patrol position was lawful.

The Court therefore grants summary judgment to Defendants on Ms. O'Neal's claims as they relate to her termination and retaliation under the FMLA.

### III. Conclusion

Defendants' Motion for Summary Judgment is GRANTED in its entirety.

IT IS SO ORDERED this 27th day of July 2021.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE